## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RONALD JACOBS**                                                    **CIVIL ACTION**

**VERSUS**                                                           **NO. 13-6294**

**WADE RIGDON, ET AL.**                                              **SECTION "I" (1)**

### REPORT AND RECOMMENDATION

Plaintiff, Ronald Jacobs, a state prisoner, filed this *pro se* civil action against Lt. Wade

Rigdon and Dr. Casey McVea in their official and individual capacities pursuant to 42 U.S.C. §

1983.[1]   On May 1, 2014, the undersigned United States Magistrate Judge issued a report

recommending that plaintiff's claims be dismissed as frivolous, for failing to state a claim on which

relief may be granted, and/or for seeking monetary damages against a defendant immune from such

relief.[2]   Plaintiff filed objections to that report.[3]   In light of those objections, the United States

---

[1]   In pertinent part, that statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress ....

42 U.S.C. § 1983.

[2]   Rec. Doc. 8.

[3]   Rec. Doc. 11.

District Judge then remanded the matter to the undersigned for further consideration.[4]  Because plaintiff made additional factual allegations and appeared to assert additional claims in his objections, he was ordered to file an amended and superseding complaint.[5]  Plaintiff subsequently filed his amended and superseding complaint,[6] and the defendants were served.[7]  A preliminary conference was then held;[8] however, not all parties would consent to trial before the undersigned pursuant to 28 U.S.C. § 636(c),[9] and the District Judge was notified of that fact.[10]  The District Judge then referred the matter to the undersigned for an evidentiary hearing and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).[11]  The undersigned thereafter conducted an evidentiary on April 14, 2015, and, based on the evidence adduced at that hearing, now issues this Report and Recommendation.

<u>I.  Plaintiff's Amended and Superseding Complaint</u>

In his amended and superseding complaint, plaintiff alleged that, while on "standard suicide watch" on June 16, 2013, he took off his paper gown and climbed on top of a table in order to kill

---

[4]      Rec. Doc. 12.

[5]      Rec. Doc. 13.

[6]      Rec. Doc. 14.

[7]      Rec. Docs. 17 and 18.

[8]      Rec. Doc. 22.

[9]      Rec. Doc. 23.

[10]      Rec. Doc. 24.

[11]      Rec. Doc. 25.

a spider crawling at the top of the cell bars.  Observing plaintiff's actions, Sergeant Sparrow came onto the tier and ordered plaintiff to get down. Lt. Wade Rigdon then arrived, confiscated plaintiff's gown, grabbed him, and shoved him toward the shower.  Rigdon applied a painful hold to plaintiff's arm, plaintiff jerked his arm away, and Rigdon slammed him to the floor.

Plaintiff was then shackled and locked in the shower to await the arrival of the prison's medical personnel.  When Nurse Buckley arrived, plaintiff explained that he was not in fact attempting suicide when he removed his gown and climbed onto the table.  However, despite plaintiff's explanation that he was simply attempting to kill a spider, Dr. Casey McVea subsequently ordered that plaintiff be placed on "extreme suicide watch" in four-point restraints.  He remained restrained in that manner for approximately fifty hours.[12]

In this lawsuit, plaintiff is bringing a claim against Wade for using excessive force when he escorted plaintiff to the shower.  Plaintiff is also suing both Wade and Dr. McVea for their roles in having plaintiff placed in four-point restraints on "extreme suicide watch" and for keeping him in such restraints for such a prolonged period.

## II.  Evidentiary Hearing

As an initial matter, the Court notes that plaintiff declined to testify at the evidentiary hearing.  On that point, the transcript reflects the following exchange:

> THE COURT:  ...  Mr. Jacobs, you can proceed as you see fit.  If you want to testify first, we could go ahead and swear you in and you can go ahead and testify.  If you want to call a witness first, you may do that.
>
> MR. JACOBS:  What I need to testify for?

---

[12]   This period included breaks to use the bathroom and eat meals.

THE COURT:  It's your case.  It's your burden of proof.

MR. JACOBS:  Okay.

....

THE COURT:  Okay. Let's go ahead, then, and swear you in, and let's get your testimony so that whatever you want to say will be under oath.  Okay?

MR. JACOBS:  (No response.)

THE CASE MANAGER:  Stand.

THE COURT:  Go ahead and raise your right hand as best you can.

MR. JACOBS:  For what?

THE COURT:  To be sworn in to testify.

MR. JACOBS:  I filed the complaint.

THE COURT:  You did, sir.  You're the plaintiff in this case and –

MR. JACOBS:  So why I got to swear to testify to what I filed on my complaint?

THE COURT:  Well, you did.  But now you're going to present your testimony so that you can prove your case, which is two things as I see it, excessive force and taking you out of the cell and taking you down, and inadequate medical care for putting you in four-point restraints for longer than you believe was necessary.  Is that correct?

MR. JACOBS:  I'm not testifying.  I'm not raising my hand and swearing to nothing.

THE COURT:  Okay.  That's your right. ...[13]

---

[13]  Rec. Doc. 53, pp. 10-11.

Rather than testifying, plaintiff instead elected to call Lt. Wade Rigdon, one of the defendants herein, as his first witness.  In his testimony, Rigdon conceded that an officer is not to use force when a prisoner is offering no resistance.[14]  When asked why he therefore used a "hands-on escort" when escorting plaintiff to the shower, Rigdon explained:  "We place our hands on an escort for your safety.  If you're restrained behind your back, it's my responsibility to protect you. If you'd fall, there's no way for you to stop yourself. You'd land face first on the ground."[15]  When plaintiff suggested that Rigdon had "grabbed" his arm, Rigdon corrected that characterization, stating:  "I didn't grab Mr. Jacobs. I placed my hand on his arm."[16]  Rigdon further explained that he subsequently forced plaintiff to the ground due to his resistance, and the following exchange occurred:

> Q.  In your report you said when I resisted to pull away from you, you then placed your right hand on my right arm and directed me to the floor.
>
> A.  Okay.
>
> Q.  Let me see what the video footage is going to show.
>
> A.  All right. Let's look.
>
> ....
>
> (Video played.)
>
> THE WITNESS:  Right there.  Before you turned, you made a move.

---

[14]  Id. at p. 13.

[15]  Id. at p. 15.

[16]  Id. at p. 19.

MR. JACOBS:  Keep playing it.

(Video continued.)

THE WITNESS:  You can clearly see you knocked my hand off of your arm.

MR. JACOBS: (CONTINUING)

Q.  Okay. Mr. Rigdon, if that move was to knock your hand off my arm, why you didn't just push me in the shower instead of taking me to the floor?

A.  Because if I would have pushed you – if I push you into the shower – first thing, I'm not trained to push an offender.  Okay?  We don't get trained to push.  All right?
If I push you into the shower, you're handcuffed behind your back, and you fall down, hit your head, then I am in trouble.
During a hands-on takedown, I have complete control of the situation.  If I push you and let you go, I have no control.[17]

On cross-examination, Rigdon further clarified his reasons for using force:

Q.  ... Now, just to clear up, you were saying there were two – two acts of resistance by Mr. Jacobs; is that correct?

A.  Yes, sir.

Q.  One that we just saw?

A.  Right before he turns to step into the shower, he pulls a little and I tell him to stop.
And whenever he turns to go in the shower, that's whenever you can clearly see him grab my hand or pull my hand trying to scratch me – or whatever his intent was there.  I don't know.

Q.  And that was the second one?

A.  Yes, sir. And you can –

Q.  When you take him down to the ground?

---

[17]  Id. at pp. 20-21.

6

A. Yes, sir.

And you can also see him on the tier standing in front of his cell -- you can see Captain Knight at that time telling him to get against the wall, and he wouldn't do it.  And that's whenever I escorted him to the shower, because he wouldn't follow the captain's orders he had to stay against the wall.

He also tried to walk back in his cell one time and Lieutenant Tullis had to put his arm up and stop him from going into the cell.

Q.  So if somebody is not obeying your verbal command, you're allowed to escalate your use of force as the case may be?

A.  Yes, sir.

Q.  In this particular instance, you went from verbal to hands on?

A.  Yes, sir.[18]

On redirect examination, Rigdon explained to plaintiff why he was initially removed from his cell and escorted to the shower:

You were removed from the cell because of the actions of you standing on your bed, and it looks like you're trying to tie your paper gown to the cell bars.  And you were currently on suicide watch.

So, yes, sir, that's why you were removed from your cell.

You were removed from your cell to be placed in the shower until we could figure out and – get with medical or mental health, whoever was on duty at that time – at that time of the morning it would probably have been just medical, mental health hadn't made it in yet – and say, hey, Offender Jacobs was standing on his bed and appeared to be tying his paper gown up.  What do we do with him?  Do we keep him on standard suicide watch or are y'all going to order something different?[19]

At the hearing, Rigdon also denied that he ordered that plaintiff be placed in four-point restraints:

---

[18]   Id. at pp. 24-26.

[19]   Id. at pp. 26-27.

> Q.  Did you order Mr. Jacobs strapped down in a four-points in the nude?
>
> A.  I cannot order any type of mental health watch, observation, or standard suicide watch or extreme four-point suicide watch.  That's all done by medical and mental health.[20]

Plaintiff's second witness was Major Thomas Mitchell, the prison's training director,[21] who testified by telephone.  Mitchell explained that placing plaintiff in the shower was consistent with the prison's standard procedures:

> That is generally how -- when they have someone who's on suicide watch and something happens, or they act out, they remove them from their cell and put them in the shower which closes and it's secure, and they stay and maintain visual until someone from medical or mental health comes and either sees them for a use of force or to make a determination as to their mental health.[22]

On cross-examination, Mitchell stated that, in his opinion, the videos of the incident showed that Rigdon followed jail policies in handling plaintiff on the day in question:

> Q.   Did Lieutenant Rigdon violate any policy, procedure, institutional directive, mandate – any other thing you can think of -- on that video?
>
> A.  From what I saw on the video, Lieutenant Rigdon acted in accordance with the policies and his training.
>
> Q.  The training of which you still do that same training now, correct?
>
> A.  Yes, I do.
>
> Q.  To cadets who come out now?

---

[20]   Id. at p. 23.

[21]   Id. at p. 48.

[22]   Id. at p. 45.

A.  Yes. And I also train our SWAT, tactical, and K-9 units.[23]

Plaintiff's third witness was Sgt. Justin DiCarlo, who testified by telephone.  DiCarlo

recounted what he observed regarding the events leading up to plaintiff's removal from his cell:

Q.  ... Now, did you actually see Mr. Jacobs take his gown off, tie it around his neck, and at the top of the ceiling on the bars?

A.  You was attempting to tie it to the top of the bars.

THE COURT:  Sergeant, were you monitoring him on the video monitor or how were you observing him?

THE WITNESS:  Yes, ma'am.  We have security monitors up there at our station, and I was observing him through those.

THE COURT:  Gotcha.  Thank you.

MR. JACOBS:  (CONTINUING)

Q.  You're saying that you seen me take my gown off and tie it at the top of the bars?

A.  Yes, sir.

Q.  And around my neck?

A.  You were standing on top of the little writing pad that y'all have on the bed –

Q.  I understand that.

A.  – and tried to tie it around the rebar.

Q.  I understand that.  I'm talking about did you see me tie it around my neck?

UNIDENTIFIED SPEAKERS ON PHONE:  (Conferring.)

_____

[23]  Id. at p. 53.

THE COURT:  Sergeant –

A.  At this time we can't see your neck, because it's behind the metal where the gate opens and closes, but you could see you trying to attempt to tie it to the rebar.

UNIDENTIFIED SPEAKER ON PHONE:  Cell bars.

A.  The cell bars.

MR. JACOBS:  (CONTINUING)

Q.  Well, if you can't see my head and my neck, then why you got to report that you observed that?

A.  You are breaking rules following the policy, standing on the bed, standing on the writing tablet.  You're already on standard suicide watch.  You had your gown off trying to tie it to the cell bars.  That's something suspicious to watch there and monitor, and you're already on suicide watch.

Q.  It was suspicious enough for you to activate the beeper?

THE WITNESS:  What did he say?

UNIDENTIFIED SPEAKERS ON PHONE:  (Conferring.)

A.  To press my beeper?

MR. JACOBS:  (CONTINUING)

Q.  Yeah.

A.  Yes, it was, being you was already on suicide watch.[24]

---

[24]  Id. at pp. 59-60.

Plaintiff's fourth witness was Nurse Laura Buckley, who testified by telephone.  She stated that, when she was summoned to examine plaintiff following the use of force, "he didn't complain of any injury.  And I didn't see any injuries."[25]

The final witness was Dr. Casey McVea, a defendant herein.  On direct examination, the following exchange occurred:

BY MR. JACOBS:

Q.  Dr. McVea, did you order me strapped down and nude on four-point?

A.  I ordered you strapped down but not nude.

Q.  Okay.  Did you consider my actions a suicide gesture or a suicide attempt?

A.  It appeared to be a gesture.[26]

He later elaborated:

A.  ... I had to make a judgment call, and I decided that the situation warranted four-point restraints.

Q.  Okay.  Do you have to state a length of time to apply those restraints on an offender?

A.  Until the offender calms down, he's going to stay on the restraints.  Now, he will be assessed at periodic intervals to see if that level of restraint is appropriate and be downgraded accordingly.[27]

---

[25]   Id. at p. 69.

[26]   Id. at p. 89.

[27]   Id. at pp. 93-94.

When plaintiff pointed out that it would not have been possible for him to actually hang himself by using the paper gown, Dr. McVea explained that was beside the point: "I wasn't judging whether you had the physical ability but whether you had the intent.  Okay?  If somebody has the intent to cause harm to themselves, they're going to find a way to do it."[28]  Dr. McVea then explained his concern was obviously warranted, because he was called to the facility a few hours later when plaintiff again attempted to harm himself while temporarily released from the four-point restraints in order to eat and use the bathroom:

> THE WITNESS:  ...  The report I received was that there was a self-inflicted laceration.  And the report also states that the offender then swallowed the razer [sic] that he used to injure himself.
>
> My note states that offender cut his right wrist with razer [sic] and then swallowed blade.
>
> My objective was the patient was in no apparent distress.  His vital signs were stable.  There was a 2-centimeter laceration to his right wrist which we closed with thermal adhesive.  His abdomen was soft, non-tender, non-distended. His bowel sounds were active.
>
> An abdominal film that I took at the facility was significant for a blade – what appeared to be a razer [sic] blade below the level of the diaphragm in the stomach. There was no free air in the abdominal cavity.
>
> So the assessment was a laceration to his right wrist and foreign body ingestion.
>
> My plan at the time was simple wound care and to keep the offender in a dry cell until the foreign body passes through the intestines.
>
> THE COURT:  Okay.  Did that affect your evaluation of the four-point restraint and its continuation?
>
> THE WITNESS:  It merely confirmed that it did need to be continued at that time.[29]

---

[28]   Id. at pp. 95-96.

[29]   Id. at pp. 107-08; see also id. at p. 115.

On cross-examination, Dr. McVea testified he had "zero" involvement in the decision to maintain plaintiff in four-point restraints *after* the day of his initial placement on extreme suicide watch; instead, that decision was made by "[t]he mental health department and the psychiatrist"[30] who work in a separate department from Dr. McVea and do not answer to him.[31]  The only reason he was involved in the events of June 16, 2013, is because that was a Sunday, a day on which the mental health department staff was unavailable.[32]

### III.  Standards of Review

Federal law mandates that federal courts "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity."  28 U.S.C. § 1915A(a).  Regarding such lawsuits, federal law further requires:

> On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint –
>
> > (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
> > (2) seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A(b).

Additionally, with respect to actions filed *in forma pauperis*, such as the instant lawsuit, federal law similarly provides:

---

[30]  Id. at p. 120.

[31]  Id. at p. 127.

[32]  See id. at p. 99.

Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action or appeal –

(i) is frivolous or malicious;
(ii) fails to state a claim on which relief may be granted; or
(iii) seeks monetary damages against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2)(B).

A complaint is frivolous "if it lacks an arguable basis in law or fact." Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994). In making a determination as to whether a claim is frivolous, the Court has "not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless." Neitzke v. Williams, 490 U.S. 319, 327 (1989); Macias v. Raul A. (Unknown), Badge No. 153, 23 F.3d 94, 97 (5th Cir. 1994).

A complaint fails to state a claim on which relief may be granted when the plaintiff does not "plead enough facts to state a claim to relief that is plausible on its face. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." In re Katrina Canal Breaches Litigation, 495 F.3d 191, 205 (5th Cir. 2007) (citation, footnote, and quotation marks omitted).

Although broadly construing the complaint[33] and fully considering the evidence adduced at the evidentiary hearing, the undersigned recommends that, for the following reasons, plaintiff's

---

[33] The court must liberally construe a *pro se* civil rights complaint. See Moore v. McDonald, 30 F.3d 616, 620 (5th Cir. 1994).

claims be dismissed as frivolous, for failing to state a claim on which relief may be granted, and/or for seeking monetary damages against a defendant who is immune from such relief.

## IV.  Plaintiff's Claims

As a preliminary matter, the Court notes that plaintiff's claims for monetary damages brought against the defendants in their official capacities must clearly be dismissed.  The defendants are state employees working at the B.B. "Sixty" Rayburn Correctional Center, a prison operated by the Louisiana Department of Public Safety and Corrections.  See, e.g., Demouchet v. Rayburn Correctional Center, Civ. Action No. 07-1694, 2008 WL 2018294, at *3 (E.D. La. May 8, 2008). State employees sued in their official capacities for monetary damages simply are not considered "persons" subject to suit under 42 U.S.C. § 1983.  Will v. Michigan Department of State Police, 491 U.S. 58, 71 (1989); Stotter v. University of Texas, 508 F.3d 812, 821 (5th Cir. 2007); American Civil Liberties Union v. Blanco, 523 F. Supp. 2d 476, 479 (E.D. La. 2007); Tyson v. Reed, Civ. Action No. 09-7619, 2010 WL 360362, at *4 (E.D. La. Jan. 21, 2010); Searls v. Louisiana, Civ. Action No. 08-4050, 2009 WL 653043, at *6 (E.D. La. Jan. 21, 2009); Demouchet, 2008 WL 2018294, at *3.  Additionally, because a claim against a state employee in his official capacity for monetary damages is actually a claim against the state itself, such claims are barred by the Eleventh Amendment.  Williams v. Thomas, 169 Fed. App'x 285, 286 (5th Cir. 2006); Tyson, 2010 WL 360362, at *4; Searls, 2009 WL 653043, at *6; Demouchet, 2008 WL 2018294, at *3.

Further, for the following reasons, it is clear that plaintiff's underlying claims must be dismissed as frivolous regardless of the capacity in which the defendants are sued.

Plaintiff's first claim is that Lt. Wade Rigdon used excessive force when escorting him to the shower. "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6 (1992) (quotation marks omitted).

The United States Fifth Circuit Court of Appeals has explained:

> Several factors are relevant in the inquiry whether unnecessary and wanton infliction of pain was used in violation of a prisoner's eighth amendment right to be free from cruel and unusual punishment. These include:
>
> 1. the extent of the injury suffered;
> 2. the need for the application of force;
> 3. the relationship between the need and the amount of force used;
> 4. the threat reasonably perceived by the responsible officials; and
> 5. any efforts made to temper the severity of a forceful response.

Hudson v. McMillian, 962 F.2d 522, 523 (5th Cir. 1992). For the following reasons, all of these factors clearly weigh against plaintiff.

As to the first factor, the parties stipulated that "plaintiff's only major complaint of injury from being taken down to the ground by Lt. Wade Rigdon was a complaint of shoulder pain."[34] Further, the only testimony on that issue at the evidentiary hearing was the unrebutted testimony of Nurse Laura Buckley, who stated that, when she was summoned to examine plaintiff following the use of force, "he didn't complain of any injury. And I didn't see any injuries."[35]

---

[34]   Exhibit #1; see also Rec. Doc. 53, p. 7.

[35]   Rec. Doc. 53, p. 69.

16

The undersigned is aware, of course, that a "serious" or "significant" injury is not required for an excessive force claim. As the United States Supreme Court has explained:

> When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

Hudson, 503 U.S. at 9 (citation omitted). That said, the United States Supreme Court has also cautioned:

> This is not to say that the absence of serious injury is irrelevant to the Eighth Amendment inquiry. The extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation. The extent of injury may also provide some indication of the amount of force applied. As we stated in Hudson, not every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind. *An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim.*

Wilkins v. Gaddy, 559 U.S. 34, 37-38 (2010) (emphasis added; internal citations, quotation marks, and brackets omitted). Because plaintiff's injury was clearly minor, this factor weighs in favor of Rigdon.

The second factor also weighs in Rigdon's favor. Rigdon testified, and the video evidence confirmed, that plaintiff resisted and attempted to free himself of Rigdon's hold during the "hands-on" escort to the shower. While plaintiff opines that *no* hold was necessary because he would have proceeded to the shower voluntarily, Rigdon provided a reasonable explanation in his testimony as to why he chose to employ a "hands-on" escort. Moreover, in any event, Rigdon obviously had no

way of knowing plaintiff's intentions with any degree of certainty, and therefore his election to use a nonviolent, "hands-on" escort was clearly within the discretion accorded to him as a correctional officer.  Further, when plaintiff did in fact resist, it was not inappropriate for Rigdon to use a measure of force to overcome that resistance, i.e. to force plaintiff to the ground.

That, of course, leads to the third factor, another factor that weighs in Rigdon's favor.  Although plaintiff suggests that the force used was disproportionate to the need, the facts indicate otherwise.  Plaintiff was not punched, kicked, or subjected to any similar uses of significant force; rather, he was merely forced to the ground, and Ridgon explained why that action was safer and preferable to shoving plaintiff, whose hands were restrained behind him, forward into the shower.  There is simply no basis on which to conclude that Rigdon's use of force was disproportionate, much less malicious or sadistic.

The fourth factor also weighs against plaintiff.  Although plaintiff presumably argues that he posed no actual threat because he was partially restrained, that argument has no merit.  At the time of the incident, plaintiff was outside of his cell with only his hands restrained.  Obviously, a partially restrained offender who is actively resisting can reasonably be perceived as posing a threat to the escorting officer's safety, as well as a security concern.  Moreover, courts must be mindful that correctional officers rarely have the luxury of sober reflection when assessing such threats; rather, they often must act "quickly and decisively" to regain control and defuse the situation.  Therefore, their decisions on such matters are "entitled to wide-ranging deference."  Baldwin v. Stalder, 137 F.3d 836, 840 (5th Cir. 1998).  That deference is clearly appropriate under the facts of the instant case.

18

The fifth factor also weighs in Rigdon's favor. His response to the active resistance and the potential threat was obviously a tempered one, in that he used only minor force to overcome plaintiff's resistance and to regain control of the situation. Moreover, as soon as plaintiff ceased resisting and the additional restraints were in place, the incident ended with no further use of force, and Nurse Buckley was summoned to evaluate whether plaintiff required medical attention.

In summary, this was not circumstance which escalated out of control, as sometimes happens in such settings. Rather, it was a merely brief encounter in which control was regained over a resisting offender through a minor use of force that resulted in, at worst, only minimal injury. Any contention that Rigdon was acting maliciously and sadistically to cause harm, rather than in a good-faith effort to maintain or restore discipline, is wholly unsupported by the evidence even when it is viewed in the light most favorable to plaintiff. Accordingly, plaintiff's excessive force claim against Rigdon should be dismissed.

Plaintiff has also sued Rigdon for the role he allegedly played in having plaintiff placed in four-point restraints on "extreme suicide watch" and for keeping him in such restraints for a prolonged period. However, in his unrebutted testimony at the evidentiary hearing, Rigdon denied that he played *any* role the decisions to utilize or maintain the four point restraints. Moreover, Dr. McVea testified that *he* was the one who made the decision to employ four-point restraints, while the decision regarding the prolonged duration of their use was made by "[t]he mental health department and the psychiatrist."[36] Simply put: the evidence shows that Rigdon's involvement was limited to escorting plaintiff to the shower so that he could be kept safe until such time as the

---

[36]   Id. at p. 120.

*medical staff* could decide what enhanced level of restraint, if any, was appropriate in light of the fact that he was observed climbing onto a table, removing his suicide gown, and apparently attempting to tie that gown to the cell bars while on "standard suicide watch."

Plaintiff next claims that his rights were violated by Dr. McVea's decision to place him on "extreme suicide watch" in four-point restraints. However, the evidence shows that, while plaintiff was already on "standard suicide watch," he took actions which were interpreted by the prison staff as an attempt to harm himself. When Dr. McVea was informed of those actions, he enhanced plaintiff's status from "standard suicide watch" to "extreme suicide watch" in four-point restraints for the reasons he clearly explained at the evidentiary hearing. Although plaintiff contends that Dr. McVea's action was arbitrary and abusive, that conclusory contention lacks any evidentiary support.

Moreover, in light of plaintiff's actions, as well as his subsequent attempt to harm himself even after being placed on "extreme suicide watch," this Court simply cannot say that Dr. McVea's decision was even facially unreasonable, much less unconstitutional. On the contrary, someone in Dr. McVea's position would be expected to err on the side of caution in such matters. Indeed, if he had ignored plaintiff's actions and plaintiff had then succeeded in committing suicide, Dr. McVea might well have been liable for failing to take additional preventative measures. See, e.g., Lewis v. Parish of Terrebonne, 894 F.2d 142, 145-46 (5th Cir. 1990). Further, to the extent that plaintiff alleges that Dr. McVea's decision ran afoul of prison directives, regulations, or policies, that allegation, even if true, is of little significance, because "a prison official's failure to follow the prison's own policies does not, itself, result in a constitutional violation." Samford v. Dretke, 562 F.3d 674, 681 (5th Cir. 2009).

Plaintiff's final claim is that his rights were violated by Dr. McVea's decision to maintain the use of four-point restraints for approximately fifty hours. The evidence shows otherwise. At the evidentiary hearing, Dr. McVea's unrebutted testimony established that his role was a limited one. Because this incident occurred on a Sunday when the mental health staff was unavailable, the initial decision of whether to utilize four-point restraints on "enhanced suicide watch" fell to Dr. McVea. Plaintiff was then monitored throughout Sunday, and the evidence demonstrates that Dr. McVea's decision to continue those enhanced procedures was reasonable, especially in light of plaintiff's second attempt to harm himself later in the day. Dr. McVea's unrebutted testimony further established that his involvement then ended on Monday on the return of the mental health staff, a separate unit of which he is not part and over which he has no control. Therefore, even if the decision to continue the enhanced procedures *after* Sunday was unreasonable, which is an issue this Court need not and does not reach, it is of no moment with respect to plaintiff's claim against *McVea* because he was not personally involved in the making of that decision. It is beyond cavil that "[p]ersonal involvement is an essential element of a civil rights cause of action." Thompson v. Steele, 709 F.2d 381, 382 (5th Cir. 1983).

For all of the foregoing reasons, it is clear that plaintiff's federal civil rights claims against Lt. Rigdon and Dr. McVea in their official and individual capacities should be dismissed with prejudice as frivolous, for failing to state a claim on which relief may be granted, and/or for seeking monetary damages against a defendant who is immune from such relief.

Lastly, to the extent that plaintiff is asserting claims under state law, the Court should decline to consider any state law claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may

decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ...."); see also Jackson v. Mizzel, 361 Fed. App'x 622, 627 (5th Cir. 2010) ("Because [the plaintiff] states not one valid federal claim, the district court properly declined jurisdiction over his Louisiana causes of action.").  If plaintiff wishes to pursue claims under state law, he should do so in the state courts.

V.  Motion for Preliminary Injunction

After the evidentiary hearing was held, plaintiff filed a motion for a preliminary injunction.[37] In that motion, plaintiff alleges that he has been denied adequate medical care for pain in his collar bone and stomach.  He asks this Court to intervene and require that he be provided with appropriate medical care.  However, the issues about which plaintiff complains in his motion are new issues unrelated to the instant lawsuit's claims, which concern only the alleged use of excessive force and plaintiff's placement on "extreme suicide watch" in four-point restraints.  Accordingly, the motion should be denied.  If plaintiff believes that he has been denied adequate medical care for pain in his collar bone and stomach, his recourse is to file a new lawsuit and, if so chooses, to file his motion for a preliminary injunction in that lawsuit.

**RECOMMENDATION**

It is therefore **RECOMMENDED** that plaintiff's federal civil rights claims be **DISMISSED WITH PREJUDICE** as frivolous, for failing to state a claim on which relief may be granted, and/or for seeking monetary damages against a defendant who is immune from such relief.

---

[37]   Rec. Doc. 52.

It is **FURTHER RECOMMENDED** that plaintiff's state law claims be **DISMISSED WITHOUT PREJUDICE** to their being asserted in the state courts.

It is **FURTHER RECOMMENDED** that plaintiff's "Motion for Preliminary Injunction," Rec. Doc. 52, be **DENIED**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[38]

New Orleans, Louisiana, this twenty-seventh day of July, 2015.



**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[38]   <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.